Clerk's Office
Filed Date:
1/19/22

U.S. DISTRICT
COURT
EASTERN
DISTRICT OF
NEW YORK
BROOKLYN
OFFICE

DCP:JPL
F. #2021R00742

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA | I N F O R M A T I O N |
| - against – | Cr. No. <u>21-628</u> (ENV)<br>(T. 18, U.S.C., §§ 982(a)(1), 982(b)(1), |
| NILSEN ARIAS SANDOVAL, | 1956(h) and 3551 <u>et</u> <u>seq</u>.; T. 21, U.S.C., § 853(p)) |
| Defendant. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE UNITED STATES CHARGES:

## INTRODUCTION

At all times relevant to this Information, unless otherwise stated:

I.  The Defendant and Relevant Entities and Individuals

  A.  Petroecuador, the Defendant and Other Ecuadorian Officials

  1.  Empresa Publica de Hidrocarburos del Ecuador ("Petroecuador") was the state-owned oil company of Ecuador. Petroecuador was wholly owned and controlled by the government of Ecuador and performed a function that Ecuador treated as its own. Petroecuador was an "instrumentality" of a foreign government and Petroecuador's officers and employees were "foreign officials," as those terms are used in the Foreign Corrupt Practices Act ("FCPA"), Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

  2.  The defendant NILSEN ARIAS SANDOVAL was a citizen of Ecuador. In or about and between 2010 and May 2017, ARIAS worked as a senior manager, including as

International Trade Manager, at Petroecuador.  ARIAS was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2)(A).

3. Ecuadorian Official #1, an individual whose identity is known to the United States, was a citizen of Ecuador and high-level government official in or about and between 1997 and 2019.  Ecuadorian Official #1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2)(A).

4. Ecuadorian Official #2, an individual whose identity is known to the United States, was a citizen of Ecuador and high-level official at Petroecuador during the relevant time period.  Ecuadorian Official #2 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2)(A).

5. Ecuadorian Official #3, an individual whose identity is known to the United States, was a citizen of Ecuador and held various positions in the Ecuadorian Ministry of Hydrocarbons in or about and between 2013 and 2016.  Ecuadorian Official #3 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2)(A).

B. Energy Trading and Asphalt Companies, Employees and Agents

6. Vitol Inc. ("Vitol") was a United States company with its principal place of business in Houston, Texas.  Vitol was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).  Vitol was beneficially owned by Vitol Holding BV, a company based in the Netherlands.  These companies, together with their affiliates (the "Vitol Group"), formed one of the largest oil distributors and energy commodities traders in the world.

7.     Javier Aguilar was a citizen of Mexico and a resident of Houston, Texas. Aguilar was an oil and commodities trader at Vitol. Aguilar was a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

8.     Sargeant Marine Inc. ("SMI") was a United States asphalt company with its principal place of business in Boca Raton, Florida. SMI was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

9.     SMI Employee, an individual whose identity is known to the United States, was a citizen of Venezuela and legal permanent resident of the United States as of approximately 2017. SMI Employee worked at SMI in or about and between 2012 and 2018. SMI Employee was an employee and agent of a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

10.    Trading Company #1, the identity of which is known to the United States, was a European energy trading company with subsidiaries around the world, including in the United States and the Bahamas. References to Trading Company #1 include its subsidiaries and affiliates.

11.    Raymond Kohut was a citizen of Canada who primarily resided in Panama. During the relevant time period, Kohut lived in the Bahamas and worked in business development for Trading Company #1 as an employee, agent and independent contractor.

12.    Trading Company #1 Employee, an individual whose identity is known to the United States, was a citizen of Spain and a resident of Switzerland. In or about and between 2009 and 2014, Trading Company #1 Employee served as a trader at Trading Company #1's

headquarters. In or about and between 2014 and 2017, Trading Company #1 Employee served as a senior manager at Trading Company #1's Bahamian subsidiary.

13. Trading Company #2, the identity of which is known to the United States, was a European energy trading company with subsidiaries around the world, including in the United States. References to Trading Company #2 include its subsidiaries and affiliates.

14. Trading Company #3, the identity of which is known to the United States, was a United States energy trading company. Trading Company #3 was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). References to Trading Company #3 include its subsidiaries and affiliates.

15. Trading Company #4, the identity of which is known to the United States, was a European energy trading company with subsidiaries around the world, including in the United States. References to Trading Company #4 include its subsidiaries and affiliates.

16. Trading Company #5, the identity of which is known to the United States, was a European energy trading company. References to Trading Company #5 include its subsidiaries and affiliates.

17. Distribution Company, the identity of which is known to the United States, was a wholesaler and distributer of oil products headquartered in Switzerland. References to Distribution Company include its subsidiaries and affiliates.

18. Transportation Company, the identity of which is known to the United States, was an oil products transportation company based in Switzerland. References to Transportation Company include its subsidiaries and affiliates.

5

C. Intermediaries and Shell Companies

19. Intermediary #1, an individual whose identity is known to the United States, was a citizen of Ecuador, Spain and the United States who resided in the United States and acted as an agent for various energy trading companies. Intermediary #1 was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

20. Intermediary #2, an individual whose identity is known to the United States, was a citizen of Ecuador and Spain and Intermediary #1's relative, who acted as an agent for various energy trading companies. Intermediary #2 was an agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

21. Intermediary #3, an individual whose identity is known to the United States, was a citizen of Ecuador and former high-level government official in Ecuador.

22. Intermediary #4, an individual whose identity is known to the United States, was an attorney who acted as an agent and representative of Trading Company #2.

23. Intermediary #5, an individual whose identity is known to the United States, was a citizen of Curaçao who owned and maintained several shell companies and bank accounts.

24. Curaçao Company #1, the identity of which is known to the United States, was a shell company formed in Curaçao by Intermediary #5. Curaçao Company #1 was principally used to receive, conceal and distribute corrupt payments from Vitol for the benefit of the defendant NILSEN ARIAS SANDOVAL and other government officials.

25. Curaçao Company #2, the identity of which is known to the United States, was a shell company formed in Curaçao by Intermediary #5. Curaçao Company #2 was

principally used to receive, conceal and distribute corrupt payments from Vitol for the benefit of the defendant NILSEN ARIAS SANDOVAL and other government officials.

26. Intermediary #6, an individual whose identity is known to the United States, was a citizen of Ecuador who acted as an agent for various energy trading companies.

27. Intermediary #7, an individual whose identity is known to the United States, was a citizen of Ecuador who acted as an agent for various energy trading companies.

28. Intermediary #8, an individual whose identity is known to the United States, was a citizen of Ecuador who acted as an agent for various energy trading companies.

  D. State-Owned Entities

29. State-Owned Entity #1, State-Owned Entity #2, State-Owned Entity #3, State-Owned Entity #4 and State-Owned Entity #5, the identities of which are known to the United States, were state-owned and controlled oil and gas entities (collectively, the "State-Owned Entities").  State-Owned Entity #1, State-Owned Entity #2 and State-Owned Entity #5 were located in Asia.  State-Owned Entity #3 was located in Latin America.  State-Owned Entity #4 was located in the Middle East.

II. The Foreign Corrupt Practices Act

30. The FCPA was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person.

III.     The Bribery and Money Laundering Schemes

31.     From in or about and between 2010 and August 2021, the defendant NILSEN ARIAS SANDOVAL, together with others, engaged in an international bribery and money laundering scheme, in which he knowingly, willfully and corruptly accepted and agreed to accept bribes made by and on behalf of energy trading and asphalt companies, in exchange for using his official position and influence, and securing improper advantages, in order to assist the companies in obtaining and retaining business with and related to Petroecuador.

32.     During his tenure at Petroecuador, the defendant NILSEN ARIAS SANDOVAL was involved in the negotiation, management and oversight of a series of direct contracts between Petroecuador and the State-Owned Entities through which the State-Owned Entities provided loans to Petroecuador secured by oil to be delivered over a period of years. Since the counterparties to these direct contracts were foreign governments, Petroecuador did not require a competitive bidding process to award the contracts.  In turn, energy trading companies entered into separate, but related agreements with the State-Owned Entities to market, sell and transport the oil products delivered pursuant to the contracts with Petroecuador.  As such, the energy trading companies effectively assumed the position of the State-Owned Entities in the contracts with Petroecuador.  In exchange for bribe payments from the energy trading companies, ARIAS used his official position at Petroecuador to assist the companies in obtaining and retaining business with and related to Petroecuador and the State-Owned Entities.

33.     In addition to overseeing contracts between Petroecuador and the State-Owned Entities, the defendant NILSEN ARIAS SANDOVAL had authority with respect to contracts between Petroecuador and other companies for a variety of petroleum products,

including crude oil, liquid petroleum gas, diesel, and asphalt. In exchange for bribe payments, ARIAS used his official position at Petroecuador to assist these companies in obtaining and retaining business with and related to Petroecuador.

34. To promote the bribery scheme and to conceal its proceeds, the defendant NILSEN ARIAS SANDOVAL and his co-conspirators, including the intermediaries described above, caused wire transfers of the bribe payments to domestic and offshore United States Dollar- and Euro-denominated accounts controlled by or associated with ARIAS. Many of those wire transfers were processed through United States correspondent banks, one or more of which cleared through the Eastern District of New York.

35. To further promote the bribery scheme and conceal its proceeds, the defendant NILSEN ARIAS SANDOVAL made several international wire transfers of the bribe payments from accounts he controlled to other accounts for his benefit, including to a bank account controlled by a close relative in the United States.

A. Bribes Received Via Intermediary #1 and Intermediary #2

i. Bribes from Trading Company #1

36. Beginning in or about 2012, the defendant NILSEN ARIAS SANDOVAL, Raymond Kohut, Intermediary #1, Intermediary #3, Trading Company #1 Employee and subsequently Intermediary #2, together with others, engaged in a bribery and money laundering scheme involving the payment of bribes to Ecuadorian government officials, including ARIAS, Ecuadorian Official #1 and Ecuadorian Official #2. The bribes paid to the Ecuadorian government officials, including ARIAS, were in exchange for, among other things, securing improper advantages for Trading Company #1 in obtaining and retaining business in connection

with contracts between Petroecuador and State-Owned Entity #1 and Petroecuador and State-Owned Entity #2.

37.     Trading Company #1 stood to benefit from the contracts between Petroecuador and State-Owned Entity #1 and Petroecuador and State-Owned Entity #2 because Trading Company #1 had entered into separate but related agreements with State-Owned Entity #1 and State-Owned Entity #2 to market, sell and transport the oil products delivered pursuant to the contracts with Petroecuador.  The defendant NILSEN ARIAS SANDOVAL was aware of the related agreements between Trading Company #1 and State-Owned Entity #1 and State-Owned Entity #2.

38.     In furtherance of the scheme, ARIAS and his co-conspirators provided, and agreed to provide, improper advantages including: (a) helping to direct Petroecuador to award contracts to State-Owned Entity #1 and State-Owned Entity #2 for the ultimate benefit of Trading Company #1; and (b) providing confidential, non-public information about Petroecuador that assisted Raymond Kohut, Intermediary #1, Intermediary #2, Intermediary #3, Trading Company #1 Employee and others, in corruptly obtaining and retaining business for, and directing business to, Trading Company #1 in connection with Petroecuador.  ARIAS also agreed to help Trading Company #1 collect oil from Petroecuador at times convenient for Trading Company #1, which minimized late fees and other fees levied against Trading Company #1 and thereby increased Trading Company #1's profits.

39.     In furtherance of the scheme, the defendant NILSEN ARIAS SANDOVAL met with his co-conspirators, including Intermediary #1, Intermediary #2,

Raymond Kohut and others, in the United States and elsewhere, to discuss the Petroecuador contracts and the terms and provisions of such contracts.

40. To promote the bribery scheme and to conceal the proceeds derived from it, Intermediary #1 and Intermediary #2 executed several sham consulting agreements with Trading Company #1. Pursuant to the sham agreements, Trading Company #1 agreed to pay companies controlled by Intermediary #1 and Intermediary #2 a purported commission per barrel of crude oil secured from Petroecuador in connection with the contracts between Petroecuador and State-Owned Entity #1 and State-Owned Entity #2. The actual purpose of the purported commissions, however, was to facilitate bribe payments to Ecuadorian government officials, including to the defendant NILSEN ARIAS SANDOVAL.

41. In or about and between 2012 and 2019, Trading Company #1 transferred approximately $70 million to bank accounts controlled by Intermediary #1 and Intermediary #2 in Switzerland, the Cayman Islands and Panama, as payment for the purported commissions under the sham agreements. In turn, after receiving the purported commissions from Trading Company #1, Intermediary #1 and Intermediary #2, at the defendant NILSEN ARIAS SANDOVAL's direction, caused a portion of such payments to be transferred via wire from the Swiss, Cayman Island and Panamanian bank accounts they controlled to bank accounts located both within the United States and in other countries, for ARIAS's benefit.

42. During the relevant period, the defendant NILSEN ARIAS SANDOVAL received approximately $15 million in bribes from and on behalf of Trading Company #1. ARIAS subsequently shared portions of such bribes with Ecuadorian Official #1 and Ecuadorian Official #2.

43. After the defendant NILSEN ARIAS SANDOVAL left Petroecuador in 2017, in furtherance of the bribery scheme, Intermediary #1 and Intermediary #2 continued to make the bribe payments that were previously offered, promised and agreed to in connection with the Trading Company #1-related contracts and other contracts until at least 2019.

  ii. <u>Bribes from Trading Company #2</u>

44. In or about 2012, the defendant NILSEN ARIAS SANDOVAL, Intermediary #1, Intermediary #3 and Intermediary #4, together with others, engaged in a bribery and money laundering scheme involving the payment of bribes to Ecuadorian government officials, including ARIAS, in exchange for, among other things, securing improper advantages for Trading Company #2 in obtaining and retaining business in connection with a contract between Petroecuador and State-Owned Entity #3.

45. Trading Company #2 stood to benefit from the contract between Petroecuador and State-Owned Entity #3 because Trading Company #2 had entered into a separate but related agreement with State-Owned Entity #3 to market, sell and transport the oil products delivered pursuant to the contract with Petroecuador. The defendant NILSEN ARIAS SANDOVAL was aware of the related agreement between Trading Company #2 and State-Owned Entity #3.

46. In furtherance of the scheme, the defendant NILSEN ARIAS SANDOVAL and his co-conspirators provided, and agreed to provide, improper advantages including: (a) helping to direct Petroecuador to award a contract to State-Owned Entity #3 for the ultimate benefit of Trading Company #2; and (b) providing confidential, non-public information about Petroecuador that assisted Intermediary #1, Intermediary #3 and Intermediary #4 in

12

corruptly obtaining and retaining business for, and directing business to, Trading Company #2 in connection with Petroecuador.

47. To promote the bribery scheme and to conceal the proceeds derived from it, Intermediary #1 executed a sham consulting agreement with a shell company in Uruguay. Pursuant to the sham agreement, the Uruguayan shell company agreed to pay a company controlled by Intermediary #1 a fee for consultancy services. The actual purpose of the purported consulting fee, however, was to facilitate bribe payments to Ecuadorian government officials in connection with the contracts between Petroecuador and State-Owned Entity #3, including to the defendant NILSEN ARIAS SANDOVAL, on behalf of Trading Company #2.

48. In or about 2012, Trading Company #2 caused approximately $1 million to be transferred to bank accounts controlled by Intermediary #1 in Panama as payment for the purported consulting fees under the sham agreement. In turn, after receiving the purported consulting fees on behalf of Trading Company #2, Intermediary #1 caused a portion of such payments to be transferred via wire to bank accounts in the United States for the benefit of the defendant NILSEN ARIAS SANDOVAL.

49. During the relevant period, the defendant NILSEN ARIAS SANDOVAL received approximately $146,000 in bribes from and on behalf of Trading Company #2.

    iii.    <u>Bribes from Vitol</u>

50. Beginning in or about mid-2015, the defendant NILSEN ARIAS SANDOVAL, Javier Aguilar, Intermediary #1 and Intermediary #2, together with others, engaged in a bribery and money laundering scheme involving the payment of bribes to Ecuadorian government officials, including ARIAS and Ecuadorian Official #3, in exchange for,

13

among other things, securing improper advantages for Vitol in obtaining and retaining business in connection with a contract between Petroecuador and State-Owned Entity #4.

51.     Vitol stood to benefit from the contract between Petroecuador and State-Owned Entity #4 because Vitol had entered into a separate but related agreement with State-Owned Entity #4 to market, sell and transport the oil products delivered pursuant to the contract with Petroecuador.  The defendant NILSEN ARIAS SANDOVAL was aware of the related agreement between Vitol and State-Owned Entity #4.

52.     In furtherance of the scheme, the defendant NILSEN ARIAS SANDOVAL and his co-conspirators provided, and agreed to provide, improper advantages including: (a) helping to direct Petroecuador to award a contract to State-Owned Entity #4 for the ultimate benefit of Vitol; and (b) providing confidential, non-public information about Petroecuador that assisted Javier Aguilar, Intermediary #1, Intermediary #2 and others in corruptly obtaining and retaining business for, and directing business to, Vitol in connection with Petroecuador.

53.     To promote the bribery scheme and to conceal the proceeds derived from it, Intermediary #1 and Intermediary #2 executed several sham consulting agreements with Curaçao Company #1 and Curaçao Company #2, which were both controlled by Intermediary #5.  Pursuant to the sham agreements, Curaçao Company #1 and Curaçao Company #2, through Intermediary #5, agreed to pay companies controlled by Intermediary #1 and Intermediary #2 a purported commission per barrel of fuel oil secured from Petroecuador in connection with the contract between Petroecuador and State-Owned Entity #4.  The actual purpose of the purported

14

commissions, however, was to facilitate bribe payments to Ecuadorian government officials, including to the defendant NILSEN ARIAS SANDOVAL and Ecuadorian Official #3.

54. To further promote the bribery scheme and to conceal the proceeds derived from it, Javier Aguilar caused wire transfers to be made from one or more Vitol Group bank accounts in the United Kingdom to bank accounts in Curaçao held in the names of Curaçao Company #1 and Curaçao Company #2, which were controlled by Intermediary #5. Thereafter, Aguilar and others caused Intermediary #5 to transfer funds from those accounts to bank accounts in the Cayman Islands and Curaçao held in the names of companies controlled by Intermediary #1 and Intermediary #2. As a way to justify the fraudulent transfers, Intermediary #2 and others created and submitted sham invoices to Curaçao Company #1 and Curaçao Company #2.

55. In turn, after receiving the purported commissions from Vitol, via Intermediary #5, Intermediary #1 and Intermediary #2 caused a portion of such payments to be transferred via wire to international bank accounts for the benefit of the defendant NILSEN ARIAS SANDOVAL and Ecuadorian Official #3. Additionally, on one or more occasions, Intermediary #5 caused payments that he received from Vitol to be wired directly from Curaçao Company #1's bank account in Curaçao to Ecuadorian Official #3's bank account in the United States.

56. During the relevant period, the defendant NILSEN ARIAS SANDOVAL received approximately $800,000 in bribes from and on behalf of Vitol.

      iv.      <u>Bribes from SMI</u>

57. Beginning in or about 2014, the defendant NILSEN ARIAS SANDOVAL, Intermediary #1, Intermediary #2 and SMI Employee, together with others, engaged in a bribery and money laundering scheme involving the payment of bribes to ARIAS in exchange for securing improper advantages for SMI in obtaining and retaining a contract to sell asphalt to Petroecuador.

58. To promote the bribery scheme and to conceal the true nature of the bribe payments, Intermediary #1, operating out of the United States, and Intermediary #2, among other things, created sham consulting contracts and invoices to conceal corrupt payments from bank accounts controlled by an SMI affiliate in Europe, through correspondent accounts in the United States, to bank accounts in Panama held in the names of shell companies that were controlled by Intermediary #1 and Intermediary #2.

59. For example, on or about July 1, 2014, an SMI affiliate entered into a sham consulting agreement with an offshore shell company controlled by Intermediary #1 and Intermediary #2. Pursuant to the sham agreement, Intermediary #1 subsequently submitted sham invoices to the SMI affiliate for payment of approximately $471,881. After Intermediary #1 received payment on the sham invoices from the SMI affiliate, he wired a portion of the money to one or more bank accounts controlled by the defendant NILSEN ARIAS SANDOVAL.

60. During the relevant period, the defendant NILSEN ARIAS SANDOVAL received approximately $250,000 in bribes from and on behalf of SMI. ARIAS subsequently shared portions of such bribes with Ecuadorian Official #2.

16

B. <u>Bribes from Distribution Company, Transportation Company and Trading Company #3</u>

61. Beginning in or about 2010, the defendant NILSEN ARIAS SANDOVAL, Intermediary #6 and employees of Distribution Company, Transportation Company and Trading Company #3, together with others, engaged in a bribery and money laundering scheme involving the payment of bribes to Ecuadorian government officials, including ARIAS and Ecuadorian Official #1, in exchange for securing improper advantages for Distribution Company, Transportation Company and Trading Company #3 in connection with numerous contracts between Petroecuador and State-Owned Entity #5.

62. Distribution Company, Transportation Company and Trading Company #3 stood to benefit from the contracts between Petroecuador and State-Owned Entity #5 because these companies, directly and indirectly, had entered into a series of separate but related agreements with State-Owned Entity #5 to market, sell and transport the oil products delivered pursuant to the Petroecuador contracts. The defendant NILSEN ARIAS SANDOVAL was aware of the related agreements between Distribution Company, Transportation Company, Trading Company #3 and State-Owned Entity #5.

63. In furtherance of the scheme, Intermediary #6 caused the payment of bribes to the defendant NILSEN ARIAS SANDOVAL on behalf of Distribution Company and Transportation Company, via wire transfer and cash payments. Intermediary #6 also promised to pay ARIAS bribes on behalf of Trading Company #3. For example, on or about and between February 10, 2012 and June 25, 2012, Intermediary #6 caused approximately $818,000 to be transferred from bank accounts located in Miami, Florida, to an account for the benefit of

17

ARIAS outside the United States.  ARIAS subsequently shared portions of such bribes with Ecuadorian Official #1.

        C.        <u>Bribes from Trading Company #4 and Trading Company #5</u>

        64.        Beginning in or about 2014, the defendant NILSEN ARIAS SANDOVAL, Intermediary #7 and Intermediary #8, together with others, engaged in a bribery and money laundering scheme involving the payment of bribes to Ecuadorian government officials, including ARIAS, on behalf of Trading Company #4 and Trading Company #5.  In furtherance of the scheme, Intermediary #7 and Intermediary #8 paid and agreed to pay bribes to ARIAS and Ecuadorian Official #2 in order to, among other things, secure improper advantages for Trading Company #4 in obtaining and retaining contracts to sell diesel fuel to Petroecuador.  Similarly, Intermediary #7 and Intermediary #8 paid and agreed to pay bribes to ARIAS in order to, among other things, secure improper advantages for Trading Company #5 in obtaining and retaining contracts to sell liquid petroleum gas to Petroecuador.

        65.        In furtherance of the scheme, Intermediary #7 and Intermediary #8 caused wire transfers to be paid as directed by the defendant NILSEN ARIAS SANDOVAL, including approximately $700,000 in bribes on behalf of Trading Company #4, as well as bribes on behalf of Trading Company #5.  For example, in furtherance of the scheme, on or about and between December 29, 2010 and July 18, 2013, Intermediary #7 caused approximately $137,000 on behalf of Trading Company #5 to be transferred from one or more accounts in the United States to one or more accounts outside the United States for the benefit of ARIAS.

## CONSPIRACY TO COMMIT MONEY LAUNDERING

66. The allegations contained in paragraphs one through 65 are realleged and incorporated as if fully set forth in this paragraph.

67. In or about and between 2010 and August 2021, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant NILSEN ARIAS SANDOVAL, together with others, did knowingly and intentionally conspire to commit offenses under Title 18, United States Code, Section 1956, to wit:

(a) to transport, transmit and transfer monetary instruments and funds from one or more places in the United States to and through one or more places outside the United States, and to one or more places in the United States from and through one or more places outside the United States, with the intent to promote the carrying on of one or more specified unlawful activities, to wit: (i) felony violations of the FCPA, in violation of Title 15, United States Code, Sections 78dd-2 and 78dd-3, and (ii) one or more offenses against a foreign nation involving bribery of a public official, in violation of the Ecuadorian Penal Code, as defined in Title 18, United States Code, Section 1956(c)(7)(B)(iv) (collectively, the "Specified Unlawful Activities"), contrary to Title 18, United States Code, Section 1956(a)(2)(A); and

(b) to transport, transmit and transfer monetary instruments and funds from one or more places in the United States to and through one or more places outside the United States, and to one or more places in the United States from and through one or more places outside the United States, knowing that such monetary instruments and funds involved in the transportation, transmissions and transfers represented the proceeds of some form of unlawful activity, and that such transportation, transmissions and transfers were designed in

whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of the Specified Unlawful Activities, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

### CRIMINAL FORFEITURE ALLEGATION

68. The United States hereby gives notice to the defendant that, upon his conviction of the offense charged herein, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

69. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    (a)    cannot be located upon the exercise of due diligence;

    (b)    has been transferred or sold to, or deposited with, a third party;

    (c)    has been placed beyond the jurisdiction of the court;

    (d)    has been substantially diminished in value; or

    (e)    has been commingled with other property which cannot be divided without difficulty;

20

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p))

*/s/ Breon Peace*
BREON PEACE
United States Attorney
Eastern District of New York

*/s/ Joseph S. Beemsterboer*
JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section
Criminal Division
U.S. Department of Justice

*/s/ Deborah Connor*
DEBORAH L. CONNOR
Chief, Money Laundering and
Asset Recovery Section
Criminal Division
U.S. Department of Justice